IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| JENNIFER MCQUEEN ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | |
| ) | |
| NORTHUP GRUMAN INNOVATION ) | |
| SYSTEMS, INC. ) | REQUEST FOR JURY TRIAL |
| ) | |
| Defendant. ) | |

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff Jennifer McQueen ("Plaintiff") and for her Complaint for Damages against Defendant Northrop Grumman Innovation Systems, Inc. ("Defendant"), and alleges and states as follows:

**Parties and Jurisdiction**

1. Plaintiff is a citizen of the United States, residing in Kansas City, Platte County, Missouri and at all times pertinent to this Complaint for Damages was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(f) et seq. ("Title VII").

1. Defendant is a foreign company registered in the State of Delaware and employing at least 15 employees within the United States.

2. Defendant's headquarters are located at 2980 Fairview Park Drive, Falls Church, Virginia.

3. Defendant continuously operates offices located at Fort Leavenworth, Leavenworth County, Kansas.

1

4. Defendant was at all times pertinent to this Complaint for Damages, an "employer" within the meaning of Title VII.

5. This Complaint is brought under Title VII, a federal statute.

6. Much of the alleged unlawful employment practices took place in the State of Kansas, within the territory of the District of Kansas.

7. Jurisdiction and venue are proper in the District of Kansas pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1391.

## Administrative Procedure and Procedural Posture

8. On or about April 11, 2019, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging Defendant discriminated against her on the basis of Plaintiff's sex and retaliated against her for making a complaint of discrimination with Defendant Company.

9. On or about September 11, 2019, the EEOC issued to Plaintiff her Notice of Right to Sue (attached as Exhibit A and incorporated herein by reference).

10. Plaintiff's Complaint is filed within ninety (90) days of the issuance of the EEOC's Notice of Right to Sue.

11. The aforesaid Charge of Discrimination provided the EEOC sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of an EEOC investigation, which could reasonably be expected to have grown out of the Charge of Discrimination.

12. Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action.

**General Allegations Common to All Counts**

13. Plaintiff was an employee of Defendant from in or about 2008 until on or about April 1, 2019.

14. Plaintiff was employed by Defendant as a Manager 1 at Defendant's location at Fort Leavenworth, Leavenworth County, Kansas.

15. Plaintiff's employment was terminated on or about April 1, 2019 by Defendant through its agents and employees.

16. John Goodsmith ("Goodsmith") became Plaintiff's supervisor in or about October 2017.

17. Prior to Goodsmith becoming Plaintiff's supervisor, Plaintiff received four promotions and had never been reprimanded or disciplined.

18. Upon becoming Plaintiff's supervisor, Goodsmith immediately began to make comments to Plaintiff stating he was going to "mentor" her; as Goodsmith made these statements, he would stroke Plaintiff's shoulder, knee, or other parts of her body.

19. Plaintiff did not consent to Goodsmith touching her.

20. Plaintiff repeatedly asked Goodsmith to stop touching her, but Goodsmith persisted.

21. Plaintiff repeatedly told Goodsmith his touching her made her uncomfortable.

22. In or about late November 2017 Plaintiff's subordinate, Dave Ennis ("Ennis") began to make advances of a sexual nature towards Plaintiff.

23. Ennis told Plaintiff that he had "admired her from afar."

24. Ennis suggested Plaintiff begin a sexual relationship with him.

25. Plaintiff declined Ennis' advances.

26. Ennis continued to pressure Plaintiff for a sexual relationship even though Plaintiff had declined Ennis' requests.

27. Ennis began sending Plaintiff explicit text messages of a sexual nature, including photos of his genitalia.

28. Ennis also began to ask Plaintiff to send her photos of her body.

29. Ennis further bragged he would never be disciplined for this conduct because he and Goodsmith were good friends.

30. In or about late November 2017 Goodsmith began assigning Plaintiff menial tasks and administrative assistant duties, even though Plaintiff was a Manager 1 with her own staff and supervisor responsibilities.

31. Goodsmith began assigning Plaintiff administrative assistant duties because she was a woman and in retaliation for Plaintiff telling him she did not like his touching.

32. Upon information and belief, Goodmsith also assigned Plaintiff administrative assistant duties in retaliation for Plaintiff rejecting Ennis' advances as Ennis was his friend.

33. In the Fall of 2017, Brian Vaught ("Vaught"), a coworker of Plaintiff's who was a fellow Manager 1, began to belittle Plaintiff over an alleged lack of knowledge, and referred to Plaintiff as "window dressing" for the project they were both working on.

34. Vaught further told Plaintiff she was only there "so the old guys would see a pretty bundle and nothing else."

35. Vaught told Plaintiff she should go home where she could be "of real value behind the curtain."

36. Plaintiff understood Vaught's "behind the curtain" comment to mean that Vaught was telling her she was only good for sex because she is a woman.

37. Vaught also accused Plaintiff of only entering his work area to flirt with another male employee, with whom Plaintiff was carpooling.

38. Vaught's insults and belittling of Plaintiff were made because Plaintiff is a woman and because of her sex.

39. Plaintiff informed her supervisor Goodsmith of Vaught's actions.

40. Plaintiff specifically told Goodsmith she wished to make a formal report and expected Goodsmith to put a stop to Vaught's discriminatory conduct.

41. Goodsmith replied that Vaught was just a bully and told Plaintiff she would have to stand up for herself without help.

42. Goodsmith's refusal to appropriately address Plaintiff's complaints about Vaught were in retaliation for Plaintiff's previously rejecting Goodsmith's touching and the sexual advances of Goodsmith's friend Ennis.

43. Plaintiff then made a complaint to Rachel Buniski ("Buniski") in Human Resources about Vaught's conduct and Goodsmith's refusal to take action.

44. After Plaintiff reported the foregoing to Buniski, Vaught apologized to Plaintiff, and Plaintiff believed the situation had been resolved.

45. Plaintiff then requested Buniski document the complaint and Vaught's apology because she feared Vaught's apology was insincere and that Vaught might treat her in a derogatory fashion again.

46. Upon learning Plaintiff had made a formal complaint with Buniski about Vaught's conduct, Goodsmith told Plaintiff she had "betrayed" leadership by "going behind their backs" to report Vaught.

47. Plaintiff reminded Goodsmith she had kept him informed of the incidents and told Goodsmith she would report the incidents to their Human Resources representative.

48. Plaintiff subsequently learned Vaught and Goodsmith were also good friends, who regularly socialized outside of work.

49. In or about late February or early March 2018 Goodsmith and Plaintiff were on a work trip at Fort Bragg, North Carolina.

50. While on this trip, Goodsmith invited Plaintiff to join him in his hotel room for a glass of wine and to "talk about her future with the company."

51. Based on the previous conduct of Goodsmith, Plaintiff reasonably believed Goodsmith's invitation to be a veiled *quid pro quo* offer to help Plaintiff advance her career in return for sex.

52. Plaintiff declined Goodsmith's invitation to meet in his hotel room and instead suggested they meet in the hotel lobby if he wanted to discuss her future with the company.

53. Goodsmith declined to meet Plaintiff in the hotel lobby.

54. After Plaintiff declined Goodsmith's offer to meet in his hotel room, Goodsmith began touching Plaintiff with even greater frequency, and began to lean into Plaintiff's personal space when talking with her, which made Plaintiff extremely uncomfortable.

55. Goodsmith's touching of Plaintiff was happening with such great frequency Plaintiff began to keep a daily count of the times Goodsmith would touch her.

56. In or around March and April 2018, Kirk Harding ("Harding"), another coworker of Plaintiff's and good friend of Goodsmith and Ennis, began threatening Plaintiff with retaliation.

57. Harding threatened to forward a personal email between himself and Plaintiff to Human Resources and told Plaintiff that he, Harding, would make Plaintiff look bad if she "did anything shitty."

58. Upon information and belief, Harding's conduct toward Plaintiff was retaliation for her rejection of Goodsmith's sexual advances, rejection of Ennis' sexual advances, and previously complaining to Buniski of Vaught's conduct.

59. During this same time frame, Ennis resumed making sexual advances towards Plaintiff.

60. Ennis would frequently ask Plaintiff out on dates which Plaintiff repeatedly declined.

61. Ennis would also invite himself to Plaintiff's hotel room on work trips and ask Plaintiff to have sex, which Plaintiff repeatedly declined.

62. In or about May 2018 Plaintiff made a written complaint to Cat Turner ("Turner") in Human Resources about the hostile work environment.

63. Plaintiff also complained to Goodsmith about Harding's threats towards her.

64. Goodsmith responded by telling Plaintiff to "deal with it."

65. Goodsmith also ordered Plaintiff to stop talking to Turner, and told Plaintiff, "We will counter anything you come up with."

66. In or about the Summer of 2018 Goodsmith began to nitpick Plaintiff's performance over minor trivial matters such as email etiquette, scheduling -- even though Plaintiff was salaried and worked on a flex-type schedule -- and began to yell at Plaintiff and belittle her in front of peers.

67. In or about June 2018 Goodsmith gave Plaintiff her mid-year review, downgrading Plaintiff's performance and alleging Plaintiff was not a good leader, that she was unable to plan, and that Plaintiff communicated poorly.

68. Plaintiff had never received a poor review prior to the mid-year 2018 review.

69. Goodsmith's downgrading of Plaintiff on her 2018 mid-year review was done in retaliation for Plaintiff's rejecting Goodsmith and his friend's sexual advances, and in retaliation for Plaintiff's making complaints to Human Resources.

70. In June 2018 Plaintiff received text messages from Ennis late at night in which Ennis requested Plaintiff send her a picture of her genitalia.

71. Ennis additionally sent a text message stating company leadership, specifically Goodsmith, Mike McGuire, and Jack Flowers, would "have his back" if Human Resources ever investigated him.

72. Ennis also stated in his texts that leadership had been discussing her complaint to Human Resources about Harding in front of him.

73. In October 2018 Plaintiff sent a written log of all of the things that had been happening to her since Goodsmith became Plaintiff's supervisor to Turner.

74. Plaintiff reported numerous instances of sexual harassment, discrimination, and retaliation by Goodsmith, Ennis, Harding, and Vaught.

75. Plaintiff did not receive a response from Turner until January 2019.

76. Turner's response to Plaintiff was that, "Any action has already been taken."

77. Additionally, in January 2019, Goodsmith placed Plaintiff on a performance improvement plan ("PIP").

78. After placing Plaintiff on the PIP, Goodsmith began to hold Plaintiff responsible for alleged timecard irregularities, which were not uniformly enforced with all employees.

79. Goodsmith also held Plaintiff responsible for an alleged security breach resulting from the action of one of Plaintiff's subordinates that Goodsmith and Mike McGuire approved without informing Plaintiff of their approval for the subordinate's actions.

80. On April 1, 2019, Goodsmith alleged Plaintiff had not completed her PIP and he and Mike McGuire terminated Plaintiff's employment.

81. Plaintiff was fired because of her sex and in retaliation for making complaints of sex discrimination, sexual harassment, and retaliation.

## COUNT I – SEX DISCRIMINATION UNDER TITLE VII

82. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 81 above.

83. Plaintiff is a woman and a member of the protected class of sex.

84. Plaintiff was subjected to sex discrimination, sexual harassment, and/or subjected to a hostile work environment at the hands of Defendant and/or Defendant's agents and subordinates, in that Defendant permitted Plaintiff's supervisors, coworkers, and subordinate employees to discriminate against and harass her because of her sex.

85. Plaintiff reported the discriminatory and harassing conduct to Defendant, and Defendant, through its agents and employees, made no attempt to correct or prohibit the discrimination.

86. Defendant, through its agents and employees, Plaintiff's, failed or refused to appropriately address Plaintiff's complaints and eventually took disciplinary action against Plaintiff for making complaints.

87. Plaintiff's sex and complaints of discrimination were the sole factors in the discrimination, hostile work environment, and retaliation Plaintiff endured; all "performance issues" alleged by Defendant were merely pretext.

88. The sex discrimination materially affected a term, condition, or privilege of Plaintiff's employment because the conduct was continuous, outrageous, humiliating, and unreasonably interfered with Plaintiff's ability to perform the functions of her employment.

89. By not taking any action to stop Defendant's employees from continuing their ongoing discrimination, harassment, and retaliation against Plaintiff, Defendant ratified, authorized and/or condoned the discrimination and retaliation perpetrated against Plaintiff.

90. Defendant knew of the discrimination, harassment, and retaliation, and failed to take appropriate action, or any remedial action whatsoever.

91. Plaintiff was discharged from her job.

92. As a direct and proximate result of the Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

93. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress, mental anguish, pain and suffering, and related compensatory damages and injuries.

94. By failing to take prompt and effective remedial action, Defendant in effect condoned, ratified, and/or authorized the discrimination against Plaintiff.

95. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from such conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant for economic damages, including, but not limited to: back pay, lost benefits, front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

### COUNT II-RETALIATION IN VIOLATION OF TITLE VII

96. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 95 above.

97. Plaintiff is a woman and a member of the protected class of sex.

98. Plaintiff engaged in protected activity under Title VII, opposing unlawful conduct by reporting sex discrimination, sexual harassment, and retaliation by her supervisor's, coworkers, and subordinates to the Human Resources Department.

99. Defendant took adverse action against Plaintiff after she made her complaints by refusing to properly investigate her complaints, refusing to protect her from known sexual harassment and discrimination, by placing Plaintiff on a PIP for pretextual reasons, by writing her up for false performance deficiencies, and firing her.

100. These adverse actions were taken in retaliation against Plaintiff for opposing the unlawful discrimination to which she had been subjected by making complaints about the discrimination, harassment, and other retaliation she was enduring.

101. As a direct and proximate result of the Defendant's actions and/or omissions, Plaintiff has been deprived of income, as well as other monetary and non-monetary benefits.

102. As a further direct and proximate result of Defendant's actions and/or omissions, Plaintiff has suffered a loss of self-esteem, humiliation, emotional distress and mental anguish and pain, and related compensatory damages and injuries.

103. By failing to take prompt and effective remedial action, Defendant, in effect condoned, ratified, and/or authorized the discrimination, harassment, and retaliation against Plaintiff.

104. As shown by the foregoing, Defendant's conduct was willful, wanton, and malicious, and showed complete indifference to or conscious disregard for the rights of others, including the rights of the Plaintiff, thus, justifying an award of punitive damages in an amount sufficient to punish Defendant or to deter them and other companies from the conduct in the future.

WHEREFORE, Plaintiff requests that the Court enter judgment in her favor and against Defendant for economic damages, including, but not limited to: back pay, lost benefits, front pay, injunctive relief, compensatory damages, punitive damages, for reasonable attorneys' fees and costs incurred herein, for pre- and post-judgment interest as allowed by law, and for such other and further legal and equitable relief as this Court deems just and proper.

**Demand for Jury Trial and Designation of Place of Trial**

Plaintiff requests a trial by jury, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

LAW OFFICE OF MADELINE JOHNSON

/s/ *Madeline Johnson*
Mary Madeline Johnson, D. Kan. # 77985
220 Main Street, Suite 201
Platte City, Missouri 64079
Telephone: (816) 607-1836
Facsimile: (816) 817-5507
Email: mmjohnsonlaw@gmail.com

ATTORNEY FOR PLAINTIFF