**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **JENNIFER MCQUEEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | **No. 19-2743-KHV** |
| | ) | |
| **NORTHROP GRUMMAN SYSTEMS** | ) | |
| **CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORDANDUM AND ORDER

On December 9, 2019, Jennifer McQueen filed suit against her former employer, Northrop Grumman Systems Corporation, alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.   Complaint For Damages (Doc. #1); Pretrial Order (Doc. #38) filed December 30, 2020.   This matter is before the Court on Defendant Northrop Grumman Systems Corporation's Motion For Summary Judgment (Doc. #39) filed January 11, 2021.   For the reasons stated below, the Court overrules in part and sustains in part defendant's motion.

### Factual Background

The following facts are either uncontroverted, deemed admitted or construed in the light most favorable to plaintiff, the non-movant.

### I.    General Factual Background

Northrup Grumman is an aerospace, defense and security company.   It does most of its business with the United States government, including the Department of Defense and the intelligence community.

Defendant employed plaintiff, a woman, from 2008 until April 1, 2019 and promoted her three times.   In June of 2016, defendant promoted plaintiff to a Manager 1 management position. In that position, plaintiff worked with approximately 30 direct reports to carry out "war games" for the United States military.

During plaintiff's employment, defendant had policies prohibiting discrimination based on sex.   If an employee experienced discrimination, he or she could report it to a manager, the human resources department ("HR") or call a toll-free phone line.

Initially, plaintiff reported to Ron Garner, who reported to Mike McGuire.   In her 2017 year-end performance review, Garner gave plaintiff a rating of "successful performer."   In October of 2017, Jon Goodsmith replaced Garner as plaintiff's supervisor and began assigning administrative duties to plaintiff.

Upon becoming plaintiff's manager, Goodsmith repeatedly told plaintiff that he was going to "mentor" her.   Goodsmith also touched plaintiff's shoulder, upper back and upper arm frequently.   Goodsmith touched plaintiff's knee ten to 15 times and gripped her upper forearm three times.   On at least three separate occasions, plaintiff asked Goodsmith to reduce the number of times he touched her because it made her uncomfortable.   Goodsmith told plaintiff that he did not mean anything by the touching, but he did not stop.   Plaintiff began keeping a daily count of the number of times that Goodsmith touched her.   McQueen Dep. (Doc. #39-2) at 17.   The highest daily count was 17 instances of touching her back.   Id.   On one occasion, plaintiff snapped at Goodsmith to stop touching her.   Goodsmith called plaintiff insubordinate and said that she must be on her period.   On another occasion, one of plaintiff's co-workers, Charles

Herrick, saw Goodsmith touch plaintiff on her thigh.[1]   Goodsmith "had to make a special effort" to touch plaintiff's thigh because she had positioned her legs away from him.   After this incident, Herrick confronted Goodsmith.   Goodsmith became nervous and explained that he "touches everyone."   Herrick pointed out that in the four years that he had known Goodsmith, Goodsmith had not touched him that way.

Herrick has never seen Goodsmith touch anyone other than plaintiff.   Plaintiff saw Goodsmith touch other employees on the arm, but not on the shoulder or knee.

From February to April of 2018, plaintiff, Goodsmith and other employees traveled to North Carolina on business.   During this time, Goodsmith approached plaintiff three times, asking to have a conversation with her in his hotel room, over a bottle of wine, about her future with defendant.   Each time, plaintiff responded that she would love to talk with Goodsmith about her future, but that she felt uncomfortable doing so in his room.[2]   Goodsmith later gave a bottle of wine to Herrick stating, "I wanted to share this with [plaintiff] but couldn't get her to come up to my room.   Maybe you'll have more luck with her."   Herrick understood this to mean that Goodsmith was unsuccessful at getting plaintiff to have sex with him.   Herrick Decl. (Doc. #41-

---

[1]      Defendant denies that Goodsmith touched plaintiff's thigh, citing plaintiff's deposition testimony that Goodsmith touched her shoulder, back, arm and knee.   Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 5.   Herrick's declaration supports plaintiff's contention that Goodsmith touched her thigh.   Herrick Decl. (Doc. #41-3) ¶ 13.   Viewed in the light most favorable to plaintiff, the record establishes that Goodsmith touched plaintiff's thigh.

[2]      Defendant characterized plaintiff's response as "declining" the invitations. Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) ¶ 18. Plaintiff's reply states that she told Goodsmith that she wished to speak with him but felt uncomfortable doing so in his hotel room.   Defendant does not expressly admit or deny this statement.   Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 2.

4) ¶ 11.  When Herrick asked Goodsmith what he meant, Goodsmith became flustered.  Id.

In May of 2018, after he returned from the business trip, Goodsmith gave plaintiff administrative assistant duties that he did not give to any of the managers who were male. McQueen Dep. (Doc. #39-2) at 26–27.  Goodsmith also began keeping a log of plaintiff's alleged performance deficiencies, including times that plaintiff missed work.  Goodsmith's log noted that "[m]any other items could have been added if [he] would have started this log in October 2017." Goodsmith Dep. (Doc #39-5) at 4.  This log also contained an entry alleging that plaintiff engaged in misconduct on October 27, 2019, seven months after defendant terminated her employment.[3] Goodsmith's log faulted plaintiff for failing to respond to an email even though the email did not require a response.[4]

---

[3]      Defendant disputes this fact because "[i]t is patently obvious that the reference to '2019' in the entry is a typographical error."  Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 10.  In support, defendant cites a quote from Goodsmith's deposition where he stated that the date "should have probably been '18."  In direct response to the question "[i]s that date correct," however, Goodsmith responded, "I don't know.  I thought it was, but I know we – I can't testify when I wrote – that date's correct.  It should have probably been '18, I don't know."  Goodsmith Dep. (Doc. #41-5) at 8.  Viewed in the light most favorable to plaintiff, Goodsmith wrote—and meant to write—that plaintiff engaged in misconduct seven months after defendant terminated her employment.

[4]      Defendant disputes this fact because it is "argumentative and incomplete." Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 9. Specifically, defendant argues that this email is "one of a series of e-mails [. . .] seeking information from plaintiff [. . .] and plaintiff was not responsive [. . . .]"  Id.  Defendant cites a portion of Goodsmith's deposition which neither party provided the Court.  Whether the email needed a response is unclear.  A subsequent email notes that the sender needed to know whether he needed one or two servers for an exercise.  Goodsmith Dep. (Doc. #41-5) at 20.  In the original email, however, the only references to two servers is the following sentence: "For UFG 18 we will have to bring 6 X EC clients (will serve as CENTRIX-K), 2 X CPOF, 6 X ARCHER PC, 5 X ARCHER laptop, and an ARCHER server x 2?. [sic]  It is our intent to attempt to connect to the K-SIM (WARSIM)data base [sic] at KBSC, this year and then push the data to wherever we will be.  Will not know until the FEP."  Given the confusing punctuation and the overall tone, read in the light most favorable to plaintiff, this email did not require a response.

In June of 2018, Goodsmith gave plaintiff her mid-year performance review.   It described plaintiff as an "excellent project lead" and stated that she had done an "excellent job."   The review also stated that plaintiff required additional focus on promptly responding to emails, hiring personnel in a timely manner, completing evaluations of direct reports by the deadlines and arriving in a timely fashion for meetings.   Plaintiff was surprised that the mid-year review was negative.[5]   Plaintiff does not dispute that she was not meeting Goodsmith's expectations. Specifically, plaintiff was not responding to emails from peers or upper leadership within one hour, responding to emails from external senders within the same day and arriving to meetings before the meeting's host.   Plaintiff notes that as of October 22, 2020, Goodsmith had not hired her replacement even though he faulted her for failing to hire personnel in a timely manner.[6]

Plaintiff testified that Goodsmith's presence affected her work performance because he made her feel as though she "couldn't do anything right, even if [she] was doing something right, or something that [she] knew was the proper procedure.   McQueen Dep. (Doc. #39-2) at 80.

## II.    Dave Ennis

In spring of 2017, defendant hired Dave Ennis, who reported to plaintiff.   When plaintiff saw Ennis' resume, she recalled an incident that had happened approximately one year earlier.

---

[5]    Defendant controverts the characterization of plaintiff's evaluation as entirely "negative."   Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 7–8.   Defendant points out that Goodsmith described aspects of plaintiff's work as "excellent."   Id.   The mid-year review contains both positive and negative comments about plaintiff's performance.

[6]    Defendant disputes this fact as argumentative.   Specifically, defendant argues that it has not posted plaintiff's former position, so Goodsmith does not need to hire a replacement. Defendant's Reply Brief In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 12.

An unknown number had texted plaintiff "you're hot" and sent a photo of male genitals.   At the time, plaintiff did not recognize the number.   When plaintiff saw Ennis' phone number on his resume, however, she recognized it as the same number.   Plaintiff did not tell anyone about the message.

After Ennis began reporting to plaintiff, he asked her about the state of her marriage. Ennis told plaintiff that there were "plenty of men willing to step in where [her] husband can't." Plaintiff told Ennis that his comments did not have any place in the workplace and ended the conversation.

In November of 2017, Ennis again inquired as to the state of plaintiff's marriage.   Plaintiff confirmed that she and her husband had been through marriage counseling.   Ennis told plaintiff that he and his wife had gone through counseling.   He also told plaintiff that he had "found that sometimes you need to supplement your marriage" and "have to find the people that can satisfy you outside of your marriage."   Ennis added that he thought he could be the person who could satisfy plaintiff outside of her marriage.   Plaintiff told Ennis that they were both married and that it's "not going to happen."   Ennis continued the conversation by telling plaintiff that he had "admired her from afar for a while" and that he had told McGuire that he would only work for plaintiff.   Plaintiff then ended the conversation.

In February of 2018, Ennis suggested to plaintiff that the upcoming business trip would be a good time for her to be his "road wife."   In March of 2018, plaintiff told Goodsmith that Ennis was "being too friendly" and "leaning too closely" to her and "invading [her] space" so much that she had to "remove herself and stand up."   McQueen Dep. (Doc. #39-2) at 25.   Goodsmith told plaintiff that she was being paranoid.   During the business trip, Ennis asked to come to plaintiff's

room two to five times. Ennis showed up at plaintiff's hotel room once, and the two discussed work and family matters.

In May of 2018, Ennis sent plaintiff a series of text messages, including one in which he asked plaintiff to take a photo of her genitals and send it to him.   In these text messages Ennis told plaintiff that senior leadership would "have his back" if defendant investigated him.[7]   <u>McQueen Dep.</u> (Doc. #39-2) at 25.

### III.   Brian Vaught

In the fall of 2017, plaintiff was working on a project with another Manager I, Brian Vaught.   Vaught sent plaintiff emails suggesting that she lacked the knowledge necessary to manage the project.   Plaintiff notified Goodsmith, who said that he would raise the issue with Vaught's supervisor.   Vaught then emailed plaintiff an apology.

In the spring of 2018, Vaught referred to plaintiff as "window dressing" and told plaintiff that she was only part of the exercise "so the old guys would see a pretty bundle."   Vaught also told plaintiff that she should "go home where [she] could be of real value behind the curtain." Plaintiff reported Vaught's comments to Goodsmith.   Goodsmith told plaintiff that Vaught was "a bully" and that plaintiff needed to try to resolve the situation with him.   Plaintiff was not satisfied with this response and reported Vaught's comments to Rachel Buniski, an HR business

---

[7]        Defendant argues that plaintiff cannot rely on these text messages because they violate the best evidence rule, Fed. R. Evid. 1002.   Specifically, defendant argues that because plaintiff has not provided the text messages, she "should be precluded from providing testimony about their alleged content or that they were even actually sent to her from Ennis."   <u>Defendant's Memorandum In Support Of Its Motion For Summary Judgment</u> (Doc. #40) at 34.   At the summary judgment stage, however, "evidence need not be submitted in a form that would be admissible at trial."   <u>Francoeur v. U.S. Bank N.A.</u>, 643 F. App'x 701, 704 (10th Cir. 2016).

partner.   Vaught then apologized for his comments.   Goodsmith subsequently told plaintiff she had "betrayed" him by reporting Vaught to HR.[8]

## IV.     Kirk Harding

From the summer of 2016 until the spring of 2018, plaintiff and Kirk Harding, a fellow Manager I, had an extramarital affair.   In the spring of 2018, after plaintiff told Harding that she did not want to continue the relationship, Harding sent plaintiff an email.   In it, Harding told plaintiff that if she were to "pull anything shitty" he would forward evidence of their relationship to HR.   Plaintiff reported this email to Goodsmith, who shared it with HR.   Harding then proceeded to call plaintiff multiple times per day and send an unsolicited photo of his genitals. McQueen Dep. (Doc. #39-2) at 39.

## V.     Plaintiff's Recording Of Workplace Conversations

Between May and August of 2018, without authorization, and without his knowledge or consent, plaintiff recorded between ten and 15 conversations with Goodsmith.   On August 17, 2018, defendant issued a written warning to plaintiff for recording workplace conversations in violation of company policy.   Plaintiff made the recordings to keep an accurate record of Goodsmith's statements to her.[9]   At some point, plaintiff informed HR that the recordings proved

---

[8]       From the record, it is not clear what Goodsmith knew about plaintiff's HR complaint about Vaught.

[9]       Defendant disputes this fact because plaintiff's desire to accurately record Goodsmith's statements "is not a sufficient basis for violating the policy."   Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 11.

Goodsmith's retaliation and collusion against her.[10]   Defendant ordered plaintiff to destroy the recordings and plaintiff did so.   Turner Dep. (Doc. #41-6) at 2.   In February and March of 2019, after this warning, plaintiff recorded five additional workplace conversations.   These conversations included three conversations with Goodsmith and plaintiff's first two performance improvement plan ("PIP") review sessions.   McQueen Dep. (Doc. #39-2) at 47.

## VI.   Plaintiff's HR Complaint In August Of 2018

In August of 2018, plaintiff reported her concerns about Goodsmith and Ennis to HR. Specifically, plaintiff reported Goodsmith's touching and requests that plaintiff come to his room and Ennis' request for photos of plaintiff's genitals.   Id. at 36, 20, 76.   Neither party has provided a copy plaintiff's HR complaint or further details about the content of the complaint.

## VII.   Performance Improvement Plan And Termination

In early 2019, defendant gave plaintiff her year-end performance review.   On the review, Goodsmith wrote plaintiff had "not shown much improvement from her Mid-Year Review which highlighted those areas that required her attention." Id. at 89.   He rated plaintiff an "inconsistent performer," the lowest of four possible ratings.   As a result, defendant placed her on a performance improvement plan ("PIP").   On January 31, 2018 defendant delivered the PIP to plaintiff at a meeting between plaintiff, McGuire, Buniski and Paul Laski, an operations manager for defendant.   McGuire administered the PIP but told plaintiff that the basis of the PIP was

---

[10]      Defendant disputes this fact because plaintiff "has never set out with any degree of specificity—or even generally—what Goodsmith supposedly said during any conversation that would have constituted such 'evidence.'"   Defendant's Reply In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 11.   At the summary judgment stage, plaintiff's sworn statement is sufficient.

information from Goodsmith.   Id. at 58.   Buniski told plaintiff that because of plaintiff's issues with Goodsmith, he would have no say or participation in the PIP.   Immediately after the meeting, however, McGuire told plaintiff that he would be getting his information about plaintiff's performance from Goodsmith.

The PIP identified four categories of deficiency: (1) difficulty completing tasks on time and in the proper format; (2) absenteeism and unusual recording of work hours; (3) accountability and career development; and (4) not demonstrating leadership characteristics.   Plaintiff met with leadership approximately every two weeks to discuss her progress.

During her first meeting, on February 19, 2019, defendant rated plaintiff satisfactory in accountability and career development and unsatisfactory in timely and proper completion of tasks, absenteeism and unusual recording of work hours and demonstration of leadership characteristics. Defendant found that plaintiff failed to timely and properly complete her work because she did not communicate with leadership before she disabled write capabilities "on a series of after action review systems."[11]   Plaintiff explained that she did so because the write capabilities created the risk of spillage—the leaking of classified information.   Id. at 60.   Defendant trained plaintiff to immediately respond to any risk of spillage and plaintiff responded as defendant had trained her. Id. at 61.   Defendant rated plaintiff unsatisfactory in absenteeism and unusual work hours because she worked outside of normal business hours.   Defendant rated plaintiff unsatisfactory in

---

[11]      Neither plaintiff nor defendant explains what "write capabilities" or "after action review systems" are.

demonstration of leadership characteristics because she improperly provided a salary range during an interview.[12]

On March 5, 2019, during her second meeting, defendant rated plaintiff unsatisfactory in all four categories.   Defendant found that plaintiff failed to timely and properly complete her work because she submitted time on her weekly timecards one day late and one day early.   Plaintiff notes that it was sometimes necessary and accepted for employees to submit time early.[13] Defendant rated plaintiff unsatisfactory in absenteeism and proper recording of work hours because plaintiff recorded only four hours of work on one day when defendant expected her to record eight.   Defendant rated plaintiff unsatisfactory in accountability and career development and demonstration of leadership characteristics because she scheduled a subordinate to work even though he was on vacation.   Plaintiff notes that at the time she scheduled the employee, he had not submitted a formal vacation request.[14]

During her third meeting, on March 19, 2019, defendant rated plaintiff satisfactory in absenteeism and unusual recording of work hours and accountability and career development.

---

[12]    During an interview with a potential new hire, plaintiff asked him what salary range he wanted.   After he answered, plaintiff stated, "I believe we can make that work."   McQueen Dep. (Doc. #39-2) at 61.

[13]    Defendant disputes this fact because plaintiff did not cite any evidence that any other employees entered time early.   Moreover, defendant argues that plaintiff was on a PIP which expressly instructed her to complete tasks on time and in the proper format.   The PIP itself notes, however, that certain circumstances require advance reporting.   McQueen Dep. (Doc. #39-2) at 99.   Viewed in the light most favorable to the plaintiff, defendant permitted employees to enter time early.

[14]    Defendant disputes this fact because the vacation calendar is not part of the record and the employee's statement that he did not submit a formal request is hearsay.   Defendant's Reply Brief In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 14.

-11-

Defendant rated plaintiff unsatisfactory in completing tasks on time and the proper format and demonstration of leadership characteristics because she did not properly communicate employee assignments 60 days before a deployment.   Plaintiff notes that she communicated the assignments within the 60 days before the deployment, but unanticipated issues required changes within the 60-day window.[15]

On April 1, 2019, at plaintiff's fourth and final meeting, defendant rated plaintiff satisfactory in timely and proper completion of tasks, accountability and career development and demonstration of leadership characteristics.   Unlike prior meetings, Goodsmith had been absent during the two weeks preceding this PIP meeting.   McQueen Dep. (Doc. #39-2) at 78. Defendant rated plaintiff unsatisfactory in absenteeism and unusual recording of work hours because she recorded time late on one day.   Plaintiff did so because she was handling an emergency matter during the time that defendant expected her to enter her time.

On the April 1, 2019, the day of her fourth review session, McGuire told plaintiff that defendant was terminating her employment for not successfully completing the PIP.   Plaintiff's termination required approval from Steve Mitchell, McGuire's supervisor, Thomas Afferton, vice president of the business unit, and Julie Anna Barker, an HR business leader.

## Legal Standard

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material

---

[15]     Defendant disputes this fact because plaintiff "seems to be engaging in a battle over semantics as to whether a 'change' outside of the 60-day window is a sufficient basis for criticizing her performance but [defendant] believed it was."   Defendant's Reply Brief In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 15.

fact and that the moving party is entitled to judgment as a matter of law.   See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Hill v. Allstate Ins. Co., 479 F.3d 735, 740 (10th Cir. 2007).   A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."   Liberty Lobby, 477 U.S. at 248.   A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position.   Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010).   Once the moving party meets the initial burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which she carries the burden of proof.   Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).   To carry her burden, the nonmoving party may not rest on her pleadings but must instead set forth specific facts supported by competent evidence.   Nahno-Lopez, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party.   Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).   It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.   Liberty Lobby, 477 U.S. at 250-51.   In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.   Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).   The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must

prevail as a matter of law."   Liberty Lobby, 477 U.S. at 251-52.

<u>Analysis</u>

Plaintiff alleges that defendant subjected her to harassment and terminated her employment in retaliation for reports of discrimination and for rejecting Goodsmith's advances.   Pretrial Order (Doc. #38).   Specifically, plaintiff asserts the following claims: (1) sexual harassment and discrimination in violation of Title VII; and (2) retaliation for reporting sex discrimination in violation of Title VII.   Id. at 9–10.   Plaintiff's first claim encompasses two theories of harassment quid pro quo harassment and hostile work environment harassment.   See Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #41) at 11–12 (plaintiff alleges that "she was discriminated against in her employment with Defendant when she was subjected to sex discrimination in the form of quid pro quo sexual harassment and the subsequent hostile work environment").   Plaintiff's second claim alleges that defendant terminated her employment because she rejected Goodsmith's advances and complained to HR about harassment by Goodsmith and Ennis.   Id.   Defendant seeks summary judgment on both claims.   Defendant also argues that under the after-acquired evidence doctrine, plaintiff's damages must be cut off from the time at which it discovered that she was still recording conversations.

**I.      Sexual Harassment And Discrimination**

Sexual harassment claims under Title VII often present in one of two forms: quid quo pro or hostile work environment.   Kelp v. B&B Lumber Co., No. 18-1103-JWB, 2018 WL 3831525, at *2 (D. Kan. Aug. 13, 2018).   Often, quid pro quo sexual harassment involves an "explicit alteration in the terms and conditions of employment."   Exby-Stolley v. Bd. Of Cty. Comm'rs, 979 F.3d 784, 838 (10th Cir. 2020).   By contrast, claims of hostile work environment involve

severe or pervasive conduct that alters the conditions of plaintiff's employment and creates an abusive working environment.   Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). While the two forms may appear to be different from each other, the Supreme Court has cautioned that they are not wholly distinct.   Jones v. Needham, 856 F.3d 1284, 1291 (10th Cir. 2017); see Burlington Indus. v. Ellerth, 524 U.S. 742, 753 (1998).   Instead, these titles are a form of shorthand that delineates different ways in which sexual harassment can occur.   Jones v. Needham, 856 F.3d at 1291.

Here, plaintiff asserts both theories of sexual harassment.   Defendant argues that it is entitled to summary judgment on both as a matter of law.

A.    **Quid Pro Quo Sexual Harassment**

Plaintiff argues that defendant fired her because she refused Goodsmith's invitation to his hotel room to drink wine and discuss her future with defendant.   Where, as here, plaintiff relies on circumstantial evidence to prove discriminatory termination, the burden shifting standard from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), applies.   Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005); Monslow, 2018 WL 5013489, at *11.[16]   Under the McDonnell

---

[16]    Plaintiff asserts—without citation or explanation—that the McDonnell Douglas burden shifting standard does not apply to her sexual harassment and discrimination claim. Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #41) at 12.   In the context of a quid pro quo claim, this district has found otherwise.   See Monslow v. Mazuma Credit Union, No. 2:17-CV-02389-JAR-GEB, 2018 WL 5013489, at *11 (D. Kan. Oct. 15, 2018) (applying McDonnell-Douglas to allegation of quid pro quo harassment); see also Langley v. Dolgen Corp., LLC, 972 F. Supp. 2d 804, 821–22 (D.S.C. 2013) (familiar proof scheme developed in McDonnell Douglas applies to quid pro quo claims").
    While not abundantly clear, the McDonnell Douglas burden shifting does not apply to hostile work environment claims.   A few courts in the Tenth Circuit cite Lounds v. Lincare for the proposition that McDonnell Douglas applies to hostile work environment claims, but Lounds
(continued…)

-15-

Douglas framework, plaintiff must establish a prima facie case of discrimination by the preponderance of the evidence.  See Plotke, 405 F.3d at 1099.  At this stage, plaintiff's burden is not onerous.  Id.  If plaintiff succeeds in establishing her prima facie case, defendant must state a legitimate, nondiscriminatory reason for the adverse employment action.  Id.  If defendant states such a reason, then plaintiff must show a genuine issue of material fact whether the proffered reasons are pretextual.  Id.

### 1.     Plaintiff's Prima Facie Case

To establish a prima facie case, plaintiff must establish that (1) she is the member of a protected class; (2) defendant subjected her to unwanted sexual conduct; (3) defendant conditioned concrete job benefits on submission to the sexual conduct; and (4) adverse job consequences resulted from plaintiff's refusal to submit to the conduct.  Benhardt v. Bd. Of County Comm'rs, 9 F. Supp. 2d 1252, 1261 (D. Kan. 1998).  Defendant does not challenge that plaintiff is the

---

[16](…continued)

involved a claim under Section 1981.  See Lounds v. Lincare, Inc., 812 F.3d 1208, 1221 (10th Cir. 2015) (applying "overarching analytical framework" articulated in McDonnell Douglas to racially hostile work environment under Section 1981).  Historically, this Court has not used the McDonnell Douglas framework to analyze hostile work environment claims.  See Ammon v. Baron Auto. Group, 270 F. Supp. 2d 1293, 1306–10 (overruling defendant's motion for summary judgment on plaintiff's hostile work environment claim without analyzing plaintiff's claims under McDonnell Douglas framework).  Moreover, other circuits have expressly held that McDonnell Douglas does not apply to hostile work environment claims.  Berbauer v. Mabus, 934 F. Supp. 2d 55, (D.D.C. 2013) ("the McDonnell Douglas framework does not apply to hostile work environment claims"); Pape v. Dircksen & Talleyrand Inc., No. 16-CV-5377-MKB-SJB, 2019 WL 1435882, at *10 n.4 (E.D.N.Y. Feb. 1, 2019) ("The Second Circuit, however, has made clear that a hostile work environment claim is subject to the 'severe or pervasive' standard").  In any event, defendant does not appear to ask the Court to apply the McDonnell Douglas framework to plaintiff's hostile work environment claim.  See Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 30–38.

member of a protected class.   Defendant argues that plaintiff cannot satisfy the second element of

her prima facie case because Goodsmith's conduct did not constitute unwelcome sexual advances.

Defendant argues that plaintiff cannot satisfy the third element of her prima facie case because

Goodsmith did not condition concrete job benefits on plaintiff's submission to his advances.

Finally, defendant argues that plaintiff cannot satisfy the fourth element of her prima facie case

because plaintiff's rejection of Goodsmith did not cause her termination.

### i.        Unwanted Sexual Conduct

Defendant argues that plaintiff cannot satisfy the second element of her prima facie case

because Goodsmith's repeated invitations to his room and refusal to meet plaintiff in public did

not constitute unwelcome sexual conduct or sexual advances.   Defendant's Memorandum In

Support Of Its Motion For Summary Judgment, (Doc. #40) at 27.   In support, defendant cites

cases that are largely inapposite.   See Sauers v. Salt Lake County, 1 F.3d 1122, 1127 (10th Cir.

1993) (no quid pro quo harassment where superior asked plaintiff to "swap spit" on one occasion);

Manko v. Deutsche Bank, 554 F. Supp. 2d 467, 472, 480 (S.D.N.Y. 2008) (no quid pro quo

harassment where superior asked plaintiff one time to get a drink or supervisor asked plaintiff one

time if she wanted to get together after work); Marques v. Voicestream Wireless Corp., 115 F.

App'x 699, 702 (5th Cir. 2004) (no quid pro quo harassment where supervisor twice asked plaintiff

to get drinks after work); Juarez v. Utah, 263 Fed. App'x 726, 739–40 (10th Cir. 2008) (no quid

pro quo harassment where person propositioning plaintiff was not her supervisor); Pinkerton v.

Colo. Dep't of Transp., 563 F.3d 1052, 1059–60 (10th Cir. 2009) (no quid pro quo harassment

where poor performance evaluations predated proposition and plaintiff denied that defendant

manufactured performance evaluations to allow for harassment).   These cases involve singular

requests, requests by subordinates or circumstances where plaintiff herself denied that defendant manufactured a claim of poor performance in retaliation for the rejection of her supervisor's advances.

On three occasions, Goodsmith asked plaintiff to come to his room to drink wine and discuss her future.  Each time, when plaintiff asked to meet in a public location, he ended the conversation.  Later, Goodsmith gave a bottle of wine to Herrick stating that maybe Herrick would "have more luck with her."  Herrick Decl. (Doc. #41-4) ¶ 11.  Herrick understood that Goodsmith had been unsuccessful at getting plaintiff to have sex with him and, when Herrick asked Goodsmith what he meant, Goodsmith became flustered.  Id.  After considering all the evidence, a reasonable factfinder could conclude that Goodsmith was asking plaintiff to his room to have sex.  That conclusion is bolstered by Goodsmith's refusal to meet plaintiff in a public location and reaction when asked what it meant that he hoped Herrick would "have more luck" with plaintiff.  Plaintiff has established a genuine issue of material fact with respect to the second element of her prima facie case.

### iii.   Concrete Job Benefits

Defendant argues that plaintiff cannot establish the third element of her prima facie case because defendant did not condition concrete job benefits on plaintiff's submission to sexual conduct.  An employer can condition job benefits explicitly or implicitly.  See Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414 (10th Cir. 1987).

To support its argument, defendant cites Juarez v. Utah, 263 F. App'x 726 (10th Cir. 2008).  In that case, plaintiff, a dental assistant, rejected an advance from a doctor. Juarez, 263 F. App'x at 730.  The Tenth Circuit affirmed the district court's grant of summary judgment on plaintiff's

-18-

quid pro quo claim "for substantially the same reasons" as the district court.  Id. at 737.  The district court found that the doctor did not condition plaintiff's employment on acquiescence to his advances because the advances were "void of any suggestion [plaintiff's] position or benefits [. . .] could be enhanced or lessened if she refused."  Juarez v. Utah Dep't of Health – Family Dental Plan, No. 2:05CV0053PGC, 2006 WL 2623905, at *15 (C.D. Utah, Sept. 11, 2006).  Here, Goodsmith repeatedly asked plaintiff to come to his room to discuss her future with defendant.  Moreover, the doctor in Juarez was not plaintiff's supervisor and had no authority to alter the terms and conditions of her employment.   Here, is undisputed that Goodsmith supervised plaintiff.

Defendant also relies upon Pinkerton v. Colo. DOT, 563 F.3d 1052 (10th Cir. 2009), which is clearly inapposite.  In that case, the Tenth Circuit found that plaintiff's employment was not conditioned on sexual favors because plaintiff "herself admitted that [her supervisor] never asked for sex, and she even denied suggesting that [her supervisor] sought to manufacture bad evaluations so that he would be able to sexually harass her."  Pinkerton, 563 F.3d at 1060.  Here, by contrast, plaintiff alleges that Goodsmith invited her to his room for sex under the guise of talking about her future with defendant and, because she rejected his advance, manufactured performance deficiencies so that defendant could terminate her employment.

A reasonable factfinder could conclude that Goodsmith implicitly conditioned plaintiff's employment on submission to his sexual advances.  Despite having been her supervisor for approximately seven months, he began keeping a detailed log of plaintiff's alleged performance deficiencies only after plaintiff rejected him.  Goodsmith Dep. (Doc. #39-5) at 12.  Goodsmith's log even noted that "[m]any other items could have been added if [he] would have started this log in October 2017."  Id. at 4.  Moreover, before Goodsmith became her supervisor, plaintiff's

-19-

performance was satisfactory.   Buniski Dep. (Doc. #41-3) at 4.   During plaintiff's PIP, defendant rated her performance more highly when Goodsmith was not the primary source of information. See McQueen Dep. (Doc. #39-2) at 80 (Goodsmith not present for time period covered by last PIP review session, where defendant gave plaintiff highest ratings).   Together, this evidence raises a genuine issue of material fact whether Goodsmith conditioned plaintiff's continued employment on submission to his sexual requests.

### iv.   Adverse Job Consequences

Finally, defendant argues that plaintiff cannot show that her rejection of Goodsmith caused her termination because it had legitimate, nondiscriminatory reasons for firing her.   For the reasons discussed below, the record reveals a genuine issue of material fact whether the proffered reasons were pretext for discrimination.   Therefore, defendant is not entitled to summary judgment on the issue of causation.

### 2.   Legitimate, Nondiscriminatory Reasons

For purposes of summary judgment, plaintiff has established a prima facie case of quid pro quo harassment. The burden, therefore, shifts to defendant to offer legitimate, nondiscriminatory reasons for the termination of plaintiff's employment.   Haug v. City of Topeka, Equip. Mgmt. Div., 13 F. Supp. 2d 1153, 1163 (D. Kan. 1998).   At this stage, defendant's burden is one of production, not persuasion, and is exceedingly light.   See Herrera v. United Airlines, Inc., 754 F. App'x 684, 690–91 (10th Cir. 2018).

Defendant asserts that it is entitled to summary judgment because it terminated plaintiff's employment for continued failure to improve her performance under the PIP.   Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 19.   Defendant

notes that plaintiff's mid-year review documented her performance deficiencies.   Id.  Because plaintiff "failed to demonstrate substantive improvement" after her mid-year review, it placed her on a PIP.   Id. at 20.   Defendant states that when plaintiff failed to improve her performance during the PIP, it terminated her employment.   Id. Defendant has satisfied its burden to provide a legitimate, nondiscriminatory reason for its action.

### 3.   Pretext

Defendant asserts that it is entitled to summary judgment because its legitimate, nondiscriminatory reasons for terminating plaintiff's employment were not pretextual.

To show pretext, plaintiff must show that a discriminatory reason motivated defendant or that the proffered explanation is unworthy of credence.   Bullington v. United Air Lines, Inc., 186 F.3d 1301, 1317 (10th Cir. 1999).   To do this, plaintiff can show weakness, implausibility, inconsistency, incoherency or contradiction in defendant's proffered reasons.   Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).   Mere conjecture is insufficient.   Id.   Here, plaintiff carries the burden of persuasion.   Herrera, 754 F. App'x at 691.

Plaintiff argues that seven facts show pretext: (1) Goodsmith only began documenting her alleged performance deficiencies after the North Carolina business trip; (2) Goodsmith's log contains an entry alleging misconduct seven months after defendant terminated her employment; (3) the log faulted plaintiff for failing to respond to an email that did not require a response; (4) Goodsmith has not hired a replacement for plaintiff's position; (5) Goodsmith wrongly faulted plaintiff for failing to timely communicate assignments; (6) defendant wrongly faulted plaintiff for scheduling a subordinate to work when he was on vacation; and (7) defendant ordered plaintiff to destroy recordings after plaintiff informed it that the recordings contained evidence of

-21-

Goodsmith's retaliation.   Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #41) at 15–17.[17]

A reasonable factfinder could find that defendant's stated reason for terminating plaintiff's employment was a pretext.   The Court's prior discussion about Goodsmith applies here: a reasonable factfinder could conclude that his dissatisfaction with plaintiff's performance only arose because she refused to come to his room during the North Carolina business trip.   Garner— plaintiff's supervisor before Goodsmith—had rated plaintiff a successful performer on her 2017 year-end review.   Goodsmith only began documenting plaintiff's alleged performance deficiencies in May of 2018, after the North Carolina trip, even though plaintiff had begun reporting to Goodsmith for seven months and Goodsmith found plaintiff's performance deficient even before the trip.

Even though Goodsmith was not the administrator of the PIP, he was still involved in the PIP process.   McGuire, the administrator of the PIP, told plaintiff that information from Goodsmith formed the basis of the PIP.   Goodsmith did not personally fire plaintiff, but McGuire—who initiated the termination of plaintiff's employment—told plaintiff that he would be getting from Goodsmith all of his information about whether plaintiff successfully completed the PIP.   Defendant has not created a genuine issue of material fact on these issues.   See Thomas

---

[17]     Defendant argues that the business judgment rule prevents the Court from questioning its reasons for terminating plaintiff's employment.   Specifically, defendant argues that the Court should not consider whether plaintiff's performance was acceptable.   While defendant is correct that the Court may not find discrimination simply because defendant made a poor business decision, the business judgment rule does not preclude the Court from considering the proffered reasons and whether those reasons are weak, implausible, contradictory, inconsistent or incoherent, and thus unworthy of belief.   See Stover v. Martinez, 382 F.3d 1064, 1073 (10th Cir. 2004).

v. Berry Plastics Corp., 803 F.3d 510, 516–17 (10th Cir. 2015) (employer insulated from biased employee's actions when employer takes care to not rely exclusively on say-so of biased subordinate).   Each PIP review session generated a document containing a space for plaintiff to provide comments, but the record contains no evidence that defendant asked plaintiff for her side of the story.   McQueen Dep. (Doc. #39-2) at 98, 101, 103, 106 (employee comments labeled "optional").   Moreover, when Goodsmith did not participate in the PIP process, plaintiff's PIP scores went up.   Viewing all of the evidence, a reasonable factfinder could conclude that plaintiff's alleged performance deficiencies were pretextual and that in relying on them to terminate her employment, defendant acted because plaintiff had rejected Goodsmith's sexual advances.

### B.      Hostile Work Environment

Plaintiff appears to argue that the combined actions of Goodsmith, Vaught, Harding and Ennis[18] created a hostile work environment under Title VII.   Plaintiff does not clearly delineate

---

[18]      Plaintiff's complaint included allegations about two coworkers: Vaught and Harding. Defendant argues that plaintiff cannot rely on them because these allegations are not in the Pretrial Order, (Doc. #38).   While plaintiff may not assert claims or theories outside the pretrial order, plaintiff may rely on facts that are not included in the pretrial order.   Hammad v. Bombardier Learjet, Inc., 192 F. Supp. 2d 1222, 1236 n.7 (D. Kan. 2002).

Defendant also argues that plaintiff effectively abandoned her hostile work environment theory of sexual harassment by making "only a passing reference to it" in her response to its motion for summary judgment.   Defendant's Reply Brief In Further Support Of Its Motion For Summary Judgment (Doc. #44) at 17.   Hostile work environment and quid pro quo claims of discrimination are two theories of one claim.   See Burlington Indus., 524 U.S. at 751 (terms quid pro quo and hostile work environment have limited utility beyond making rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether).   The facts that underlie both theories can overlap, as they relate to the same Title VII violation.   See Jones v. Needham, 856 F.3d at 1291.   Plaintiff could have more clearly delineated the two theories in her briefing, but the Court does not read the record as abandoning her hostile work environment theory.

her quid pro quo and hostile work environment claims, instead arguing both theories under her first count.   Defendant argues that it is entitled to summary judgment because the actions of Goodsmith, Ennis, Vaught and Harding are "legally inconsequential."   Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 31, 34, 36.   More specifically, defendant argues that as a matter of law, the conduct of Goodsmith, Ennis, Vaught and Harding was not severe or pervasive.

To succeed on a claim of hostile work environment, plaintiff must show that (1) defendant discriminated against her on the basis of sex and (2) that the discrimination was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment."   Meritor, 477 U.S. at 67 (internal quotation omitted); Gillette v. Unified Gov't of Wyandotte Cnty./Kan. City, No. 13-cv-2540-TJJ, 2015 WL 4898616, at *15 (D. Kan. Aug. 17, 2015).   Plaintiff must show that the environment was both objectively and subjectively hostile, but she need not show psychological harm or that her work suffered because of the harassment. Jones v. Rent-A-Center, Inc., 240 F. Supp. 2d 1167, 1181 (10th Cir. 2002).   To determine whether a work environment is sufficiently hostile, the Court examines the frequency and severity of the conduct, whether it was threatening or humiliating and whether it interferes with plaintiff's work performance.   Harris v. Forklift Sys., 510 U.S. 17, 23 (1993).   Whether conduct was sufficiently pervasive or severe is a quintessential question of fact that is particularly unsuited for summary judgment.   Jones v. Rent-A-Center, Inc., 240 F. Supp. at 1182–83.

### 1.    Based On Sex

Defendant argues that plaintiff's sex did not motivate Goodsmith to repeatedly touch her.[19] Specifically, defendant argues that plaintiff "witnessed Mr. Goodsmith touch at least some men in a manner similar to that which she claims to constitute harassment."   Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 33.   The record demonstrates a genuine issue of material fact on this issue.   While plaintiff admits that she saw Goodsmith touch two male employees on the arm, she also noted that she never saw Goodsmith touch another employee on the shoulder or knee.   McQueen Dep. (Doc. #39-2) at 19.   Defendant cites no evidence that Goodsmith touched other employees with the same daily frequency that he touched plaintiff.   In fact, the record shows that Goodsmith did not do so.   Herrick Decl. (Doc. #41-4) ¶ 14 (in four years, Goodsmith never touched Herrick the way he touched plaintiff).

When a female employee is "physically harassed in a way that male employees are not, the unwelcome touching is presumptively gender-based."   Jones v. Wichita State Univ., 528 F. Supp. 2d 1222, 1239 (D. Kan. 2007).   On these facts, a reasonable factfinder could conclude that plaintiff's sex motivated Goodsmith's repeated touching of plaintiff.

Defendant also argues that Harding's behavior is not attributable to plaintiff's sex, but to the end of their extramarital affair.   In support, defendant cites Conklin v. County of Suffolk, 859

---

[19]    Defendant does not argue that plaintiff's sex did not motivate Ennis or Vaught. Ennis' conduct was overtly sexual (requesting and sending photos of genitals) and Vaught's comments were gender-based (telling plaintiff that she was "window dressing" and was only there "so the old guys would see a pretty bundle and nothing else" and that she "should go home where she could be of real value behind the curtain").   Accordingly, the Court assumes for purposes of summary judgment that the conduct of Ennis and Vaught was based on plaintiff's sex.   See Gillette, 2015 WL 4898616, at *16 ("Conduct which is overtly sexual may be presumed to be based on gender[.]").

F. Supp. 2d 415 (E.D.N.Y. 2012), in which plaintiff—a male—ended an extramarital affair with a female coworker.  See Conklin, 859 F. Supp. 2d at 418.  Plaintiff alleged that the coworker created a hostile work environment by then using the photocopy machine and water cooler by his desk, using his desk to read the newspaper, making passing, derogatory comments about his wife and leaving unnecessary notes at his workspace.  Id. at 419–20, 425–26.  In granting summary judgment for defendant, the court found that the alleged harassment was likely a product of personal animosity, rather than discriminatory intent.  Id. at 428.  Similarly, defendant cites Succar v. Dade County Sch. Bd., 229 F.3d 1343 (11th Cir. 2000).  There, after a male plaintiff ended a romantic relationship with a female coworker, the coworker began verbally and physically harassing plaintiff and sought to embarrass him in front of colleagues.  Succar, 229 F.3d at 1344. In affirming the district court's grant of summary judgment for defendant, the Court found that the coworker's conduct resulted from personal animosity rather than plaintiff's gender.  Id. at 1345. Here, Harding's conduct was overtly sexual rather than simply acrimonious or annoying. Conduct that is overtly sexual may be presumed to be based on gender.  See Gillette, 2015 WL 4898616, at *16.

Viewed in the light most favorable to plaintiff, plaintiff's sex motivated Goodsmith, Harding, Ennis and Vaught.

## 2.  Sufficiently Severe And Pervasive

Construed in the light most favorable to plaintiff, the record supports a finding that the harassment by Goodsmith, Harding, Ennis and Vaught was sufficiently severe and pervasive to alter the conditions of plaintiff's employment and create an abusive working environment. Beginning in October of 2017, Goodsmith repeatedly touched plaintiff on her upper arm and

forearm, back, shoulder and knee without her consent and despite repeated requests to stop. McQueen Dep. (Doc. #39-2) at 19.   At one point, plaintiff snapped at Goodsmith for touching her and Goodsmith called her insubordinate and said that she must be on her period.   Herrick Decl. (Doc. #41-4) ¶ 12.   Goodsmith invited plaintiff to his hotel room three times to drink wine and discuss her future and, after plaintiff rejected him the third time, gave a bottle of wine to a co-worker stating that he hoped he would have more luck with plaintiff.   Herrick Decl. (Doc. #41-4) ¶ 11.   After this trip, Goodsmith gave plaintiff extra administrative assistant duties that he did not give to the male managers and began tracking alleged deficiencies in plaintiff's performance. McQueen Deposition (Doc. #39-2) at 26–27.

Plaintiff testified that Goodsmith's presence affected her work performance.   McQueen Dep. (Doc. #39-2) at 80.   Specifically, plaintiff testified that Goodsmith made plaintiff feel as though she "couldn't do anything right, even if [she] was doing something right, or something that [she] knew was the proper procedure."   Id.   Defendant gave plaintiff higher marks on her PIP when Goodsmith did not provide input.   Id.

In addition to Goodsmith. Ennis made several comments about plaintiff's marriage and his desire to have sex with her.   Specifically, he stated that "there are plenty of men who are willing to step in where [plaintiff's husband] can't," and that he could "be the person who can satisfy [plaintiff] outside of [her] marriage," that he admired her from afar and that she should be his "road wife."   Id. at 23–24.   When plaintiff told Goodsmith that Ennis was being "too friendly," Goodsmith told her that she was being paranoid.   Id. at 25.   Later, over text message, Ennis asked plaintiff for a photo of her genitals and told her that her superiors, Goodsmith and Mike McGuire, would have his back in HR matters.   Id. at 24–25.

-27-

Vaught and Harding contributed to plaintiff's hostile work environment. Vaught repeatedly belittled plaintiff. He told her that she "obviously" had "no idea what we really do," that she was "window dressing" and was only there "so the old guys would see a pretty bundle and nothing else" and that she "should go home where she could be of real value behind the curtain." Id. at 26–27. When plaintiff complained to Goodsmith, he told her that he would not intervene because Vaught was a bully and she needed to try to resolve the dispute herself. Id. at 30. Unsatisfied with this response, plaintiff reported Vaught's conduct to HR. When Goodsmith realized that plaintiff had gone to HR, he accused her of "betraying him." Id. at 31–32.

Finally, after plaintiff and Harding concluded their extramarital relationship, Harding threatened plaintiff that he would "go directly to HR" with evidence of their affair if she chose to "pull anything shitty," called plaintiff multiple times per day and sent an unsolicited photo of his genitals. Id. at 38–39.

Defendant argues that as a matter of law, Ennis could not sexually harass plaintiff because she was his superior. In support, defendant cites Gaff v. St. Mary's Reg'l Med. Ctr., 506 F. App'x 726, 727 (10th Cir. 2012). In Gaff, however, the harasser's conduct "would not have offended anyone else." Gaff, 506 F. App'x at 728. The same cannot be said for Ennis' repeated propositioning of plaintiff, requests for photos of her genitals and assurance that plaintiff's superiors would have his back if HR questioned him.

Defendant also argues that plaintiff could not have found Ennis' behavior to be subjectively hostile because it occurred four months before she reported it to HR. Plaintiff told Goodsmith that Ennis was making her uncomfortable, however, and Goodsmith told her that she was being

paranoid.   McQueen Dep. (Doc. #39-2) at 25; see also id. at 15 (one approved method of reporting sexual harassment was to tell manager).

Defendant argues that the individual conduct of Goodsmith, Ennis, Harding and Vaught does not rise to the level of "severe and pervasive."   Even if each claim is not individually severe and pervasive, plaintiff may aggregate sexually harassing conduct to satisfy the severity and pervasiveness requirements.   See Throupe v. Univ. of Denver, 988 F.3d 1243, 1255 (10th Cir. 2021) (viewing "isolated incidents" "in the aggregate" in evaluating hostile work environment claim in Title IX action); Hicks, 833 F.2d at 1416 (plaintiff may aggregate allegations of sex discrimination and race discrimination).   Defendant does not address whether the four actors, considered together, created a severe and pervasive hostile work environment for plaintiff.

Viewed in combination with each other and in the light most favorable to plaintiff, the record reveals a genuine issue of material fact whether defendant subjected plaintiff to a hostile work environment.   A jury could reasonably find that the repeated propositioning, touching and sexual requests of Ennis and Goodsmith, the belittling remarks of Vaught, the threatening and unsolicited behavior of Harding, combined with Goodsmith's refusal to correct the behaviors of Ennis and Vaught, created a severe and hostile work environment.   In short, defendant has not demonstrated that it is entitled to judgment as a matter of law on plaintiff's hostile work environment claim.

## II.   Retaliation

In her second claim, plaintiff argues that defendant terminated her employment because she complained to HR about the sexual harassment that she experienced and because she rejected Goodsmith's advances.   Defendant argues that it is entitled to summary judgment because

plaintiff cannot demonstrate that her opposition to an unlawful practice caused the termination of her employment.

Title VII prohibits retaliation against an employee because he or she has "opposed" an unlawful practice under Title VII or because he or she made a charge, assisted or participated in an investigation, proceeding or hearing under Title VII.   42 U.S.C. § 2000e-3(a); Salemi v. Colo. Pub. Emps. Ret. Ass'n, 747 F. App'x 675, 695 (10th Cir. 2018).

Because plaintiff does not provide direct evidence of discrimination, plaintiff must rely on the McDonnell Douglas framework.   Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1225 (10th Cir. 2008).

### A.     Plaintiff's Prima Facie Case

To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) defendant took action against her that a reasonable person would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action.   Payan v. UPS, 905 F.3d 1162, 1172 (10th Cir. 2018). Plaintiff alleges that defendant retaliated against her for (1) reporting the alleged harassment in August of 2018; and (2) rejecting Goodsmith's advances.

### 1.     Plaintiff's HR Complaint In August of 2018

Plaintiff alleges that defendant retaliated against her for reporting harassment by Goodsmith and Ennis in August of 2018.   For purposes of summary judgment, defendant stipulates that plaintiff engaged in protected activity when she filed her complaint and that termination constitutes an adverse employment action.   Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 39.   Defendant argues, however, that plaintiff

cannot establish a causal connection between her complaint in August of 2018 and the termination of her employment eight months later, in April of 2019.   Specifically, defendant notes that it began addressing plaintiff's performance deficiencies in June of 2018—two months before she complained to HR.

To establish a causal connection, plaintiff must show that defendant's desire to retaliate motivated it to commit the challenged conduct.   Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1203 (10th Cir. 2008).   Protected activity that is closely followed by an adverse action may justify an inference of retaliatory motive.   Marx v. Schnuck Mkts., 76 F.3d 324, 329 (10th Cir. 1996).   The Tenth Circuit has held that a six-week period between an adverse action and a protected activity is close enough to establish causation, but a three-month period is not.   See Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999).

Standing alone, the eight-month period between plaintiff's HR complaint in August of 2018 and her termination in April of 2019 is insufficient to raise an inference of causation.   See Hinds v. Sprint/United Mgmt. Co., No. 05-2362-KHV, 2006 WL 3715905, at *12 (D. Kan. Dec. 12, 2006) aff'd, 523 F.3d 1187 (10th Cir. 2008) ("Standing alone, four months between the protected activity and adverse action is insufficient to show causation").   Plaintiff must therefore provide other evidence of causation.

As additional evidence of causation, plaintiff argues that "all events subsequent to the North Carolina business trip are tainted by Goodsmith's retaliatory animus."   Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #41) at 18.

While a close question, a genuine issue of material fact exists whether defendant terminated plaintiff's employment because she complained to HR in August of 2018.   Although eight months

passed between plaintiff's HR complaint in August of 2018 and her termination in April of 2019, approximately four months passed between plaintiff's HR complaint and her year-end review. The year-end review was so poor that defendant placed plaintiff on a PIP. When plaintiff allegedly failed to improve her performance on the PIP, defendant terminated plaintiff's employment. While defendant alleges that plaintiff's performance was poor prior to her mid-year review, Goodsmith rated plaintiff as a successful performer in June of 2018. Goodsmith only rated plaintiff as an inconsistent performer—thus triggering the PIP—after plaintiff's HR complaint in August of 2018.

Viewing all of the evidence in the light most favorable to plaintiff, a reasonable factfinder could conclude that Goodsmith rated plaintiff an inconsistent performer, thus triggering plaintiff's PIP and ultimate termination, because she complained to HR in August of 2018. Even if Goodsmith was dissatisfied with plaintiff's performance in October of 2017, and even if he noted some deficiencies in plaintiff's performance at her mid-year review, he only rated plaintiff's performance poorly after she complained to HR in August of 2018. Indeed, it was only after plaintiff's HR complaint that plaintiff's performance rating documented any deficiencies, even though those deficiencies had been ongoing for more than a year. Given these facts, a genuine issue of material fact exists whether Goodsmith rated plaintiff an inconsistent performer—thus triggering her PIP and termination—because she complained to HR in August of 2018.

### 2.    Plaintiff's Rejection Of Goodsmith

Plaintiff also argues that defendant retaliated against her by terminating her employment for rejecting Goodsmith's advances. While plaintiff's argument is not a model of clarity, she implies that in rejecting Goodsmith, she was "opposing" discrimination under Title VII. <u>See</u>

<u>Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment</u> (Doc. #41) at 19 ("Plaintiff has clearly presented ample evidence from which a jury could determine she was [. . .] retaliated against for engaged in the protected activity of opposing [. . .] sexual harassment.")   Defendant does not expressly address this characterization of plaintiff's retaliation claim.

As discussed above, to establish a prima facie case of retaliation plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) defendant took action against her that a reasonable person would have found materially adverse; and (3) a causal connection exists between the protected activity and the adverse action.   <u>Payan</u>, 905 F.3d at 1172.

### a.        Protected Opposition

Under this characterization of plaintiff's retaliation claim, the Court must determine whether rejecting a supervisor's advances constitutes protected activity under Title VII. Defendant does not argue that it is not.

In <u>Crawford v. Metropolitan Government of Nashville and Davidson County, Tenn.</u>, the Supreme Court broadly defined opposition in the context of Title VII.   Specifically, it stated that because the statute does not define "oppose" it carries its ordinary meaning to "[t]o resist or antagonize. . .; contend against; confront; resist; withstand[.]" <u>Crawford v. Metropolitan Gov't of Nashville and Davidson Cnty., Tenn.</u>, 555 U.S. 271, 276 (2009) (first alteration and omission in original) (citing Webster's New International Dictionary 1710 (2d ed. 1957)).

It does not appear that the Tenth Circuit has addressed this issue.   But see <u>Ogden v. Wax Works, Inc.</u>, 214 F.3d 999, 1007 (8th Cir. 2000) (telling supervisor to stop offensive conduct is most basic form of protected activity); <u>EEOC v. New Breed Logistics</u>, 783 F.3d 1057, 1067 (6th

Cir. 2015) (Title VII opposition clause protects employee who resists or confronts supervisor harassment); LeMaire v. Louisiana, 480 F.3d 383, 389 (5th Cir. 2007) (before Crawford, affirming summary judgment for defendant because plaintiff provided no legal authority for proposition that rejecting sexual advances constitutes protected activity); see also Owen v. County of Franklin, Va., 358 F. Supp. 3d 545, 550–51 (W.D. Va. 2019) (Fifth Circuit neither assessed Title VII opposition clause nor indicated why complaint to harassing supervisor would not fall within Title VII's protective purview).

Given Crawford's expansive definition of "oppose" and the persuasive authority of other circuits, the Court holds that resisting, contending against, confronting and withstanding a supervisor's advances constitute protected opposition activity under Title VII.

Here, viewed in the light most favorable to the plaintiff, the record reveals that plaintiff participated in protected activity when she resisted Goodsmith's requests to go to his hotel room to discuss her future with defendant and drink wine.

### b.    Materially Adverse Action

In the pretrial order, plaintiff contends that her poor mid-year review was the "first concrete retaliation by Goodsmith."   Pretrial Order (Doc. #38) at 6.   A poor performance review, however, does not constitute adverse action unless it has adverse effects on future employment.   See Munoz v. W. Res., Inc., 225 F. Supp. 2d 1265, 1270 (D. Kan. 2002).   Here, plaintiff does not allege that her mid-year performance review adversely affected her future employment.   Plaintiff's termination, however, is clearly an adverse employment action.

### c.    Causation

To succeed in establishing her prima facie case of retaliation, plaintiff must draw a causal

connection between her rejection of Goodsmith in the spring of 2018 and the termination of her employment in April of 2019. As discussed above, the time-period of 11 months between plaintiff's rejection of Goodsmith and her termination—standing alone—is insufficient to create an inference of causation. See Hinds, 2006 WL 3715905, at *12. Therefore, plaintiff must provide additional evidence of causation.

As evidence of causation, plaintiff relies on Goodsmith's general lack of credibility and his motivation to retaliate. Goodsmith began documenting plaintiff's alleged performance deficiencies immediately after she rejected his advances on the North Carolina business trip even though he began supervising her in October of 2017 and believed that her performance was deficient before the trip to North Carolina. Goodsmith's documentation served as the foundation for plaintiff's year-end review and PIP. See McQueen Dep. (Doc. #39-2) at 89 ("Ms. McQueen has not shown much improvement from her Mid-Year Review which highlighted those areas that required her attention."). Because Goodsmith's documentation started so soon after she rejected him, a reasonable factfinder could infer that plaintiff's rejection caused Goodsmith to view and document plaintiff's performance as poor. Viewing these facts in the light most favorable to plaintiff, a reasonable factfinder could conclude that after plaintiff rejected him, Goodsmith began a long campaign of manufacturing performance deficiencies so that defendant could terminate her employment.

## B. Legitimate, Nondiscriminatory Reasons

Because plaintiff has established a prima facie case, the burden shifts to defendant to provide legitimate, nondiscriminatory reasons for the adverse action. Haug, 13 F. Supp. 2d at 1163 (citing Berry, 74 F.3d at 986). Defendant's burden is one of production, not persuasion, and

is exceedingly light.   See Herrera, 754 F. App'x at 690–91.

As discussed above, defendant asserts that it terminated plaintiff's employment for performance deficiencies—not because of retaliation.   Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 19, 41.   Specifically, defendant argues that it terminated plaintiff's employment because of her failure "to correct well-documented performance deficiencies over a ten-month period."   Id. at 41.   Defendant has satisfied its burden on this issue.

### C.    Pretext

As discussed above, a reasonable factfinder could find that defendant's explanation for terminating plaintiff's employment was pretextual.   A reasonable factfinder could conclude that Goodsmith's dissatisfaction with plaintiff's performance only arose because she complained to HR and rejected his advances.   Garner—plaintiff's supervisor before Goodsmith—had rated plaintiff a successful performer on her 2017 year-end review.   Goodsmith began documenting plaintiff's alleged performance deficiencies only after she rejected him, even though plaintiff had been reporting to him for seven months.   Goodsmith only rated plaintiff an inconsistent performer after she complained to HR.   McGuire told plaintiff that information from Goodsmith formed the basis of the PIP, and that he would be getting from Goodsmith all of his information about whether plaintiff successfully completed the PIP.   The record contains no evidence that McGuire independently verified that plaintiff's performance was deficient.   Indeed, when Goodsmith could not provide input, plaintiff's PIP scores went up.   From this evidence, a reasonable factfinder could conclude that plaintiff's alleged performance deficiencies—as documented at her mid-year, year-end and PIP reviews—were pretextual.

III.    **Damages**

In August of 2017, defendant disciplined plaintiff for recording workplace conversations. McQueen Dep. (Doc. #39-2) at 88.   At her deposition on August 20, 2020, plaintiff testified that she nonetheless continued to record workplace conversations.   Id. at 46.   Defendant argues that under the after-acquired evidence doctrine, plaintiff's damages must be capped.   Plaintiff does not respond to this argument.   See Memorandum In Opposition (Doc. #41).

Where defendant can show that it would have terminated plaintiff's employment for continuing to record conversations in the workplace, had defendant known about it, plaintiff is only entitled to damages up to the date of the discovery.   See McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 362–63 (1995); Zisumbo v. Ogden Reg'l Med. Ctr., 801 F.3d 1185, 1203, 1205 (10th Cir. 2015).   Here, defendant provides the declaration of Cat Turner, a human resources representative, that defendant would have fired plaintiff had it known that she continued to record workplace conversations.   Turner Dec., (Doc. #39-7) ¶ 7.   Defendant does not allege a specific date on which it learned that plaintiff continued to record workplace conversations.   Instead, it states plaintiff "testified in her August 2020 deposition that despite the warning, she proceeded to [. . .] record at least five additional conversations [. . .] Had Northrop Grumman been aware of plaintiff's repeated and blatant violations of its recording policy, the company would have moved forward with terminating her employment."   Defendant's Memorandum In Support Of Its Motion For Summary Judgment (Doc. #40) at 24 (emphasis in original).   Plaintiff's deposition occurred on August 20, 2020.   McQueen Dep. (Doc. #39-2) at 4.   Absent a more specific allegation from defendant, the Court, therefore, assumes that defendant learned of plaintiff's continued recording on August 20, 2020.   Plaintiff has not demonstrated a genuine issue of material fact whether

defendant would have fired her if it had known that she continued to record conversations after her reprimand.  Plaintiff's damages are therefore limited to the time period before August 20, 2020.

### Conclusion

Plaintiff has established a genuine issue of material fact as to her sexual harassment and discrimination claim under both a quid pro quo and hostile work environment theories of harassment and her retaliation claim.   Plaintiff has not established a genuine issue of material fact whether defendant would have terminated her employment had it known that she continued to record workplace conversations after her reprimand in August of 2018.   Her damages are therefore limited to the time before August 20, 2020.

**IT IS THEREFORE ORDERED** that Defendant Northrop Grumman Systems Corporation's Motion For Summary Judgment (Doc. #39) filed January 11, 2021 is **OVERRULED, except on the issue of its damages, as outlined above.**

Dated this 27th day of July, 2021 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge